## Albert T. McGinn *vs.* B. H. Gladding Dry Goods Co.

### JUNE 13, 1917.

PRESENT: Parkhurst, C. J., Sweetland, Vincent, and Baker, JJ.

*(1) Leases. Conditions.*

While at preliminary negotiations for a lease of a stable, lessee stated that it would take the premises if the stable was high enough to accommodate certain delivery wagons which had been ordered, yet when some two weeks later lessor received the lease by mail executed by lessee, he was entitled to assume that the letting was complete and unconditional, and there was no meeting of the minds of the parties upon the subject of a conditional letting at the time of the execution and delivery of the lease.

*(2) Leases. Evidence.*

Where a lease was executed by an officer of a corporation, who had deceased prior to the trial, evidence by one who was not present at the time of the execution of the lease, tending to show that such officer signed it in reliance upon statements theretofore made at an interview between lessor and witness in presence of such officer as to the premises being able to accommodate wagons of lessee, to show that the lease was delivered on condition, was inadmissible.

*(3) Leases. Conditions.*

Where a lease is unconditional on its face, and was received duly executed by lessee through the mail by lessor some two weeks after a preliminary conversation between the parties, evidence relating to statements made by lessor at such preliminary interview is immaterial.

*(4) Leases. Fraudulent Misrepresentation.*

A statement by lessor that he would "guarantee this barn is high enough to carry any delivery wagon that ever was built" is not a misstatement of fact within lessor's knowledge, where lessee knew that he had never seen the wagons and that he had no more actual knowledge of them or their height than he had. Such a statement is no more than "dealers' talk," not to be relied upon by prudent business men.

*(5) Leases. Surrender.*

Where a lease was executed June 26, and about July 15 lessee notified lessor of his intention to give up the premises, at which time lessor notified him that he would hold him to the lease, and lessee continued to occupy the premises after it had found that they would not accommodate its new wagons, for some time, and on August 8, sent the key by mail to lessor, without any letter or notice, such facts did not amount to a surrender and acceptance.

*(6)   Leases.   Surrender.*

Where a lease was executed June 26, and about July 15 lessee notified lessor of his intention to give up the premises, at which time lessor notified him that he would hold him to the lease, and lessee continued to occupy the premises after it had found that they would not accommodate its new wagons, for some time and on August 8 sent the key to lessor by mail without any letter or notice, and lessor on September 1 rented the premises to a third party without notice to lessee, for one month, and on October 21 sent a bill to lessee for three months' rent, giving credit for the amount received from the tenant, and later re-let the premises for five months without notice to lessee, both lettings being without the knowledge or assent of lessee, such acts operated as an acceptance of the surrender by lessee from and after September 1.

COVENANT. Heard on exceptions of plaintiff and sustained.

PARKHURST, C. J. This is an action for breach of a covenant to pay the rent covenanted and agreed to be · paid in a certain lease from the plaintiff to the defendant corporation; the lease in evidence bears date June 11, 1907, but appears to have been signed by the parties on June 26, 1907, and to have been acknowledged by the plaintiff before a Notary Public June 26, 1907, and to have been duly recorded in Providence on July 15, 1907; the premises are described as " a certain stable at rear of No. 386 Fountain Street, in said City of Providence, comprising twenty (20) stalls and one (1) box stall and all the floor space above the same." The lease is in common form, containing the usual covenants and is for the term of three years from July 1, 1907, to July 1, 1910. The amended declaration in the first count alleges non-payment of rent in the sum of $1,158; in the second count, alleges breach of the covenant to keep the interior of the premises in repair, and claims damages therefor; no evidence in support of this second count was offered, and it is therefore immaterial.

Defendant's first plea to first count says that the lease is not its deed; defendant's second plea to first count

alleges payment of rent up to July 12, 1907, and a surrender of the premises to the plaintiff and his acceptance thereof on the 12th day of July, 1907.

The suit was brought after the expiration of the term, by writ of summons dated and served March 31, 1911; thereafter, jury trial having been waived, the case was tried before the Presiding Justice of the Superior Court in Providence without a jury September 27, 1916, upon the issues tendered by the first count of the amended declaration and the pleas thereto; September 29, 1916, the Presiding Justice filed his decision, in favor of the defendant, and thereafter in due time the plaintiff prosecuted his bill of exceptions to this court, and the case is now before us upon said bill of exceptions. The exceptions alleged in the bill are six in number; exceptions First to Fifth inclusive are based upon the admission of evidence offered by defendant and objected to by the plaintiff; exception Sixth is based upon the decision of the justice in favor of the defendant.

It appeared in evidence that negotiations between the plaintiff and certain officers representing the defendant corporation were begun sometime in June, 1907, looking to a lease of the plaintiff's stable above described, to the defendant, and the plaintiff put in evidence a certified copy of the recorded lease above described; none of the witnesses on either side were able to fix the exact date of such negotiations, but all admitted that they were in June, 1907; we are left to infer that these negotiations were about the 11th day of June, 1907, since that is the first date appearing in the lease, which was admitted to have been signed and delivered by the parties; it also appears that the lease was prepared by plaintiff's attorney and sent to defendant by plaintiff; and it appears by said lease that the same was signed by both parties and acknowledged by the plaintiff June 26, 1907. It is not disputed that the lease was signed by the defendant's

proper officer, duly authorized, that he held it in his possession about a week before returning it to plaintiff and that it was delivered to the plaintiff by mail; but the defendant claimed and attempted to prove that, although the lease is absolute on its face, and was delivered to the plaintiff himself, it was nevertheless executed and delivered upon the condition that it was not to be binding upon the parties, unless it later appeared that the stable would permit of the entry therein of certain new delivery wagons which the defendant had ordered to be built for it, and as to the exact height of which at the time of the negotiations in June, 1907, the defendant was not fully advised. It appears that certain officers and employees of the defendant, including William E. Aldred, then President of the defendant and who afterwards executed the lease, and Arthur L. Aldred, then Vice-president, and the defendant's superintendent and delivery clerk, went to inspect the plaintiff's stable and there met the plaintiff, presumably about June 11, 1907; that they examined the premises very carefully, and found that the location and size of the stable and its general accommodations were quite suitable for their purpose; and they admit that they needed to use the stable at once and were very anxious to get it; it is claimed by the defendant's witnesses and denied by the plaintiff, that at that time mention was made of the fact that new delivery wagons had been ordered and not yet received and that it was a question whether or not the entrance to the stable was high enough to admit of the entry of these new wagons; and the defendant's witnesses further claim that at that time the plaintiff assured them, emphatically, with certain profane words, that he would " guarantee this barn is high enough to carry any ———— ———— delivery wagon that ever was built; " and Mr. Arthur L. Aldred testifies that after considering all other phases of the situation he (A. L. Aldred) said: "All right, under those

conditions, barn is high enough to carry delivery wagons, we will take it," and that McGinn then said: "All right, you don't have to take it, if it isn't because it wouldn't be any good to you." All of this is denied by the plaintiff. This interview is the only interview which the evidence shows to have taken place between the plaintiff and the defendant's officers with reference to the negotiations for a lease, and prior to the execution thereof and its delivery to the plaintiff by mail on or about June 26, 1907. The admission of the testimony recited above from several witnesses in support of the defendant's claim that the lease was executed and delivered by the defendant upon condition as above set forth, was objected to on behalf of plaintiff and exceptions thereto were duly taken, and these form the basis of exceptions First to Fifth, inclusive, in the bill of exceptions.

The evidence shows that the defendant was in great need of this stable and that by its agents and servants it took possession of the stable immediately after the above interview to clean up and make repairs, and placed several horses in the stable without waiting for the execution of a lease; that thereafter on the 26th of June, 1907, the lease without any condition was executed and acknowledged by plaintiff, and was executed by defendant and delivered to plaintiff as above shown, and that, without any protest or mention as to the absolute and unconditional terms of the lease, the defendant continued after the execution and delivery of the lease to occupy and use the premises for several horses and at least one wagon; that nothing was said at the time of execution and delivery by defendant or anyone on its behalf to plaintiff about any conditional execution and delivery; it thus appears that some two weeks elapsed between the interview on or about June 11, 1907, and the execution and delivery about June 26, 1907, during which time, for all that appeared to the plaintiff, the defendant might

have ascertained that the height of the stable entrance was sufficient for the entry of the new wagons. There is nothing to show that at the time when the unconditional lease was executed and delivered between the parties, the plaintiff had any idea that the delivery then made by the defendant was supposed by the defendant to be conditional. The talk about the height of the delivery wagons was preliminary; it was within the defendant's power to have ascertained their exact height and to have informed itself in the time which intervened whether the stable entrance was high enough to admit them. The plaintiff had no knowledge or means of knowledge as to the height of the wagons.

Assuming that the plaintiff in fact said on or about June 11, 1907, all that the defendant's witnesses testified, (1) plaintiff might, on June 26, 1907, upon the execution and delivery to him of the unconditional lease, assume that the letting was complete and unconditional. There was no meeting of the minds of the parties upon the subject of conditional letting at the time of the execution and delivery of the lease.

It further appears that defendant continued to occupy the stable with horses and at least one wagon after the execution and delivery of the lease up to some time in July or August, 1907, which does not definitely appear.

It further appears that at some date not definitely fixed, between the 10th and 15th of July, 1907, one of the new delivery wagons arrived in Providence, and that on such arrival an attempt was made to put the new wagon into the stable and it was found after several trials that the height of the entrance was not sufficient to allow the wagon to enter; that thereupon the representatives of the defendant, Mr. A. L. Aldred, Mr. Steed, the superintendent, and Mr. Joslin, superintendent of delivery, who had been present at the stable when it was attempted unsuccessfully to place the new wagon therein, went back to the

store of the defendant, and talked the matter over with Mr. W. E. Aldred, President, and decided that they could not use the stable for the new wagons; that within a day or two afterward, Mr. A. L. Aldred and Mr. Steed again went up to the stable and saw the plaintiff there and told him they could not get the new wagons into the stable and so that the stable would be useless to the defendant and they would have to give it up; both Aldred and Steed in substance testified that the plaintiff said: " That is all right." . . . " I don't ask you to take anything " . . . " that you can't use," . . . " that will be all right."

It further appears that the stable was at that time, and had been since some time in June, in continuous use by the defendant, as above set forth, for its horses and one wagon; that this last interview was about the 15th day of July, 1907; that the plaintiff went on that day to his attorney, who advised him to put his lease on record, and who wrote to the defendant, at plaintiff's request, a letter to the effect that he would hold the defendant on the lease; that the defendant did not at this last interview with plaintiff on or about July 15, 1907, at once abandon the premises, but continued to occupy them for a time which is nowhere definitely fixed by the evidence; it does appear, however, that the defendant, without any letter or notice, sent to the plaintiff the key of the stable by registered mail received by the plaintiff on the 8th day of August, 1907; that the plaintiff thereafter, without further communication with or notice to defendant, rented the stable for one month from September 1, 1907, for $30; that October 21, 1907, he sent a bill to defendant for rent for three months, July 1-October 1, 1907, $117.99, and gave defendant credit for amount received for September, $30, balance $87.99; it does not definitely appear that this bill was ever received by defendant or that any reply thereto was ever made, but it does appear that this bill was not

paid and nothing was ever paid under the lease by the defendant. It further appears that plaintiff again rented the stable to another party for five months, February-June, 1908, inclusive, and that he received therefor $150; and that there was no further rental during the period covered by the lease.

Upon this state of the evidence the defendant claimed: 1. That then the delivery of the lease was conditional as above set forth; 2. That even if this were not so found, there was a surrender by the defendant and acceptance thereof by the plaintiff, in fact, on or about July 15, 1907; or, if that were not found to be the fact, that in any event there was a surrender and acceptance by operation of law, by reason of the abandonment of the premises by the defendant, the sending of the key to the plaintiff August 8, 1907, and the subsequent letting of the property by the plaintiff on September 1, 1907, to a third party.

The Presiding Justice of the Superior Court, in his rescript filed September 29, 1916, stated that he was of the opinion " that the preponderance of the evidence shows that the lease was never actually executed but was to take effect only upon the condition that the premises proved to be high enough to admit the defendant's new delivery wagons. It turned out that the premises would not admit said new delivery wagons."

This court is not able to agree with this finding of fact. From our analysis of the evidence above set forth, we are unable to find that the lease was executed and delivered upon any such condition. It is not disputed that it was executed and delivered by a duly authorized officer of the defendant corporation, its president, William E. Aldred, and sent by mail to plaintiff; that the lease, unconditional upon its face, was in defendant's possession for about a week before it was delivered to the plaintiff, and it is not claimed by anyone that anything was said to the plaintiff at the time when it was delivered to him, that any con-

dition was insisted upon. It further appears that William E. Aldred died sometime prior to the institution of this suit, and it does not appear that any person was (2) present at the time he signed the lease except the witness to his signature. It was attempted to be shown through the witness Arthur L. Aldred that his brother signed the lease in reliance upon the statements theretofore made at the interview above recited (sometime between June 11 and June 26, 1917) between the plaintiff and this witness in presence of said William E. Aldred. This testimony was objected to on behalf of plaintiff, on the ground that this witness, not being present at the execution and delivery of the lease, could not know whether or not the lease was delivered upon any condition. We are of the opinion that this evidence was incompetent and inadmissible and should have been excluded; exception Third, which is based upon the admission of this testimony, is sustained.

We are also of the opinion, in view of our analysis of (3) the testimony above, that exceptions First, Second, Fourth and Fifth must be sustained. These all relate to the admission of evidence on behalf of the defendant over plaintiff's objection relating to the statements made by plaintiff at the interview in June prior to the execution and delivery of the lease. In view of what we have said as to the unconditional delivery of the lease on or about June 26, 1907, all these statements were immaterial and inadmissible in accordance with the general rule stated in *Abney* v. *Twombly,* 39 R. I. 304, 317 *et seq.,* where it was attempted to prove by evidence of certain prior oral conversations and statements between the parties to a sale and conveyance of land that the grantor had in fact agreed to convey a certain *exclusive* right of way as appurtenant to the land afterwards conveyed, although the deed itself did not by its terms convey an *exclusive* right of way; as to the evidence this court said, p. 318: " We

think that all this evidence was immaterial and incompetent; the deed is in no way ambiguous on its face, and is to be construed without reference to any prior understandings or promises on the part of the grantor or his agent; and parol evidence as to such matters is not to be considered.''

The general rule that contracts in writing shall not be modified by testimony relating to prior oral conversations, &c., is well-stated in *Putnam Foundry & Machine Co.* v. *Canfield,* 25 R. I. 548, 552: '' The rule invoked '' . . . '' is a most salutary one and this court has uniformly adhered to it. *Gardner* v. *Chace,* 2 R. I. 112; *Sweet* v. *Stevens,* 7 R. I. 375; *Vaughan* v. *Mason,* 23 R. I. 348; *Martin* v. *Clarke,* 8 R. I. 389; *Dyer* v. *Print-Works,* 21 R. I. 63; *Watkins* v. *Greene,* 22 R. I. 34; *Myron* v. *Railroad Company,* 19 R. I. 125. It is based upon the common sense theory that ' when parties deliberately put their engagements into writing in such terms as import a legal obligation, without any uncertainty as to the object or extent of such engagements, it is conclusively presumed that the whole engagement of the parties and the extent and manner of their undertaking was reduced to writing; and all oral testimony of a previous colloquium between the parties, or of conversations or declarations at the time when it was completed or afterwards (as it would tend in many instances to substitute a new or different contract for the one which was really agreed upon, to the prejudice, possibly, of one of the parties) is rejected.' 1 Greenl. Ev., 16th ed., § 275.'' See also *Wolf* v. *Megantz,* 184 Mich. 452 (lease); *Ryan* v. *Cooke,* 172 Ill. 302, 309; *O'Malley* v. *Grady,* 222 Mass. 202 (lease); *Findley* v. *Means,* 71 Ark. 289; *Caulfield* v. *Hermann,* 64 Conn. 325; *Naumberg* v. *Young,* 44 N. J. L. 331 (lease). Very many cases have been cited by plaintiff's counsel in support of the same general doctrine as applied to leases and other conveyances of real estate, as well as to other con-

tracts in writing; all of them have been examined; but it would unduly extend this opinion to cite and comment upon them; those which we have cited are typical cases, and those of them which relate to leases are quite in point under the facts of this case.

This court is not unmindful that there are many cases relating to leases where it has been held admissible to prove by oral testimony that, at the time of *delivery* of a lease, even though delivered directly to the party or parties thereto and not to a third party in *escrow,* there may be such a condition imposed by a contemporaneous oral agreement as will prevent the lease from becoming bind-. ing and effectual between the parties until such condition has been fulfilled, and that such condition may be proved by oral testimony even though the lease upon its face is absolute. Several such cases have been cited on behalf of the defendant, in the attempt to support its first defence that the lease in the case at bar was delivered upon condition.

*Hinsdale* v. *McCune,* 135 Iowa, 682, cited for defendant, was a suit for rent under a lease, where the defendant pleaded and was allowed to prove false and fraudulent misrepresentations of facts within the plaintiff's knowledge as to the suitability of the premises for defendant's business, made by plaintiff at the time of the letting as an inducement to defendant to take the lease; the proof of the fraud was ample and uncontradicted; and the case was determined upon this point. In the case at bar there was no fraudulent misrepresentation of facts within (4) plaintiff's knowledge, which misled the defendant. If the plaintiff said that he would " guarantee this barn is high enough to carry any —— —— delivery wagon that ever was built " (as claimed by defendant's witnesses), that was not a misstatement of fact within plaintiff's knowledge; he had never seen the intended new delivery wagons of the defendant, and defendant's agents knew

that he had no more actual knowledge of them or their height than they had.   His remark, as shown by its very language, was no more than mere '' dealers' talk '' (*Handy* v. *Waldron,* 18 R. I. 567, 569), not worthy to be relied upon by prudent business men.   The case of *Hinsdale* v. *McCune, supra,* is not in point under the facts of the case at bar.

*Metzger* v. *Roberts,* 26 Ohio Cir. Ct. 675, was a suit for rent where defendant pleaded a contemporaneous parol agreement made at the time a written lease was executed, by which the lease was only to be used in organizing a corporation, and transferring the same to it, and was under no circumstances to be a valid lease between the original parties; and it was further pleaded that to allow the plaintiff to collect rent from defendant would be a fraud on him under the facts; parol evidence of the oral agreement was held admissible both to prove a condition, and also to prove the fraud pleaded.

*Donaldson* v. *Uhlfelder,* 21 App. D. C. 489, was a suit to collect rent, wherein the defendant was allowed to prove that at the very time of the tender of the lease to him he refused to accept it unless upon the express promise of the lessor to make certain repairs; that the lessor then and there promised to make the repairs and the defendant then signed the lease and delivered it to lessor's agent, and that the repairs were never made; and it was held proper evidence and a good defence.

*Cartledge* v. *Crespo,* 25 N. Y. Supp. 515, and *Davis* v. *Jones,* 17 C. B. 625, were cases very similar in legal effect to the two previous cases; there was a *contemporaneous* oral agreement to repair, as a condition precedent to the validity of the lease, and as an inducement to get it signed.   Some other cases are cited on the same point on behalf of the defendant; such of them as are in any way applicable here are similar in effect to those above set

forth. Some of them relate to contracts other than leases, and in some of them the delivery of the contract was expressly in *escrow* to a third person.

It is enough to say that while we do not now find it necessary to further discuss the cases cited by defendant on this point, we do find that such cases as support the proposition that a lease absolute on its face and actually delivered between the lessor and lessee may be shown by oral testimony to have been delivered upon a condition precedent not to become valid unless the condition is fulfilled, are based upon facts showing that such oral agreement was in fact contemporaneous with the delivery and shown by competent evidence of witnesses knowing the fact to be so, and to be the inducement whereby the lessee at the time of the delivery was influenced to execute the lease. We are of the opinion that the evidence offered that the lease in this case was delivered upon a condition as claimed by the defendant fell far short of proving such conditional delivery and was incompetent and inadmissible for the reasons above set forth; the plaintiff's exceptions based upon the admission of such evidence (exceptions First, Second, Fourth and Fifth) are therefore sustained.

(5) We now come to the question whether there was at any time a surrender by the defendant and an acceptance thereof by the plaintiff. From our analysis of the evidence above set forth, we are unable to find that there was any surrender in fact by the defendant in July, 1907, and consequently there could have been no acceptance of surrender at that time by the plaintiff. The defendant continued to occupy the premises for such purposes as it saw fit after it found that the new wagons would not go into the stable; there is no evidence to show just when it removed its horses and other property from the stable; and the only act of abandonment at a definite time appearing in the record was its sending of the key of the

stable to the plaintiff by registered mail on or about August 8, 1907; it does not appear that defendant occupied the stable after that time; it does definitely appear that the plaintiff notified the defendant in writing on July 15, 1907, that he would hold it on the lease. The key was sent by defendant to plaintiff on August 8, 1907, without any letter or notice, and plaintiff kept the key; there is no evidence that plaintiff took possession of the stable or did any act in relation thereto, until September 1, 1907, when he rented it to a third party without notice to defendant. There is nothing to show that defendant in any way gave its consent to such letting, nor is there any conclusive evidence that the defendant ever received notice at any time that the stable was let to other parties.

The mere sending of the key to the plaintiff without more, has been frequently held in this State not to be a surrender and acceptance; and this is in accord with the authorities elsewhere. *Smith* v. *Hunt*, 32 R. I. 326, 330, and cases cited and cases *infra*.

The sole question now remaining is whether the reletting by the plaintiff on September 1, 1907, worked an acceptance of the surrender as a matter of law. This bald question as to the effect of a reletting by the landlord after abandonment by the tenant and without notice to him or assent, express or implied on his part, and without other acts and circumstances from which an acceptance of the surrender in fact or as a matter of law may be inferred, has not heretofore arisen in any reported case in this State. In the case of *White* v. *Berry*, 24 R. I. 74, 79, there were many acts on the part of the landlord, from which it was found that the landlord's acceptance of surrender was to be implied; among these acts was the actual reletting of the premises without consulting with the defendant (p. 79). In *Smith* v. *Hunt*, 32 R. I. 326, there was no reletting during the time for which rent was claimed, and it was held that the facts proved showed only

such acts on the part of the landlord after abandonment by the tenant as the landlord was entitled to do for the protection of the abandoned property, and with a view to reletting it; that these acts were done with full knowledge of the defendant; and that there was no acceptance of surrender.

The plaintiff has cited several cases in support of his claim that the reletting by plaintiff, although without notice of such reletting to defendant, and without notice that such reletting would be on the lessee's account, was not as a matter of law an acceptance of the surrender; *Biggs* v. *Stueler*, 93 Md. 100; *Oldewurtel* v. *Wiesenfeld*, 97 Md. 165; *Alsup* v. *Banks*, 68 Miss. 664; in these cases there was express refusal to accept surrender; and notice was given to the lessee that the lessor would rent the property for the account and risk of the lessee, and hold the lessee for any loss.

In *Joslin* v. *McLean*, 99 Mich. 480, cited by plaintiff, there is nothing in the report of the case to show that there was any reletting during the time covered by the suit for rent accrued; and the court found nothing to show any acceptance of surrender by the landlord; the key was sent by the lessee to lessor by mail without notice or comment; the lessor simply took possession and undertook to rent the property; but it does not appear that he was trying to recover rent for any period of time after he actually rented the property. In *Stewart* v. *Sprague*, 71 Mich. 50, cited in *Joslin* v. *McLean*, *supra* (but not referred to in plaintiff's brief), it does appear that the court held that the lessor, after abandonment which was not accepted, could relet for account of the abandoning lessee, and hold him for the loss, and that notice of intention to relet was not essential or material; in *Scott* v. *Beecher*, 91 Mich. 590, also cited in *Joslin* v. *McLean*, *supra*, the recovery sought was only for the time during which the property remained vacant and it was held that

the reletting did not operate as an acceptance of surrender by operation of law so as to relieve the lessee from payment of the rent under the lease for the portion of the year during which the property remained vacant.

In *Auer* v. *Penn.*, 99 Pa. St. 370, there was an express refusal to accept the surrender and there was express and repeated notice in writing to the surety of the lessee that he would be held for the rent, and that the premises would be rented at his risk.

In *Higgins* v. *Street*, 19 Okla. 45, there was reletting after notice of a similar nature.

In *Rose Mercantile Co.* v. *Smith*, 71 So. Rep. 487, the holding upon this point was merely incidental, and whether or not notice of reletting was given or whether the reletting was done under such circumstances as to imply the assent of the lessee does not appear.

*Holden* v. *Tanner*, 6 La. Ann. 74, seems to hold that reletting without notice to the lessee does not release the surety on the lease and is not evidence of the acceptance of the surrender. This case is not in accord with the cases cited *infra;* this case, and that of *Stewart* v. *Sprague, supra,* are the only cases cited by plaintiff which seem to go to the extent claimed by plaintiff in his brief. It appears in the case at bar that there was no sufficient proof of an abandonment and surrender of the premises by the lessee prior to the sending of the key to the landlord on August 8, 1907; at that time under the evidence it may be assumed that there was evidence of intention on the part of the tenant to surrender the premises to the landlord; at that time, however, the landlord did not attempt to notify the lessee that he would not accept surrender of the premises, nor did he ever at any time notify the lessee that he would rent the premises for account of or at the risk of the lessee and would hold the lessee for the balance of the agreed rent over and above what he should be able to get by way of rent of the premises for,

the balance of the term. It does not appear that the plaintiff as landlord, after the receipt of the key on August 8, 1907, gave any notice of any kind to the lessee refusing to accept the surrender; it does appear that on September 1, 1907, he rented the premises to a third party for one month, and that on October 21, 1907, after this reletting, he sent a bill to the defendant for three months' rent, and gave the defendant credit for $30 received from his tenant; it is not shown that the defendant ever received this bill, but it does appear at least that it never was paid; after this reletting there was a further reletting for five months to still another party, and as to this reletting there was no notice or attempt at notice to the defendant, so far as the evidence shows, either before or after the reletting.

The defendant contends that under these circumstances the reletting by plaintiff was, as a matter of law, an acceptance of the surrender; that the creation of this new tenancy was '' Of such a character as to have been inconsistent with the defendant's continued possession and use of the property,'' and cites in support of such contention a number of cases where a reletting after abandonment by a lessee has been held to be, as a matter of law, an acceptance of surrender, although the lessor, at the time of abandonment by the lessee, had refused to accept surrender and release the lessee.

In *Gray* v. *Kaufman Dairy and Ice Cream Co.*, 162 N. Y. 388, there was a lease from plaintiff to defendant of certain premises in New York City for a term of ten years from August 1, 1893, and the lessee entered into possession, and remained and paid rent to November 1, 1893, and then moved out and abandoned the premises, and sent the keys to the plaintiff by mail; the plaintiff received the keys about November 2, 1893, and on November 3, 1893, sent the following notice to the defendant: '' Yesterday I received the keys of 787 Eighth Avenue by

mail. I hereby notify you that I do not accept a surrender of the premises, and that I intend to hold you responsible for the rent under the lease. I shall let the premises on your account, and hold you for any loss which may be sustained.'' The defendant made no answer to this notice; but there were further personal negotiations between the parties looking to a compromise or arrangement whereby the matters in dispute would be settled. On or about December 1, 1893, the plaintiff let the premises to a third party, but it did not appear that this reletting was on account of the defendant or with its consent; it did appear that the reletting was in plaintiff's own name. The gist of the opinion is well stated in the headnote, *viz.:* ''A surrender of the leased premises is created by operation of law, although the landlord has declined an offer of surrender, where after the tenant has abandoned them the landlord lets them in his own name to a third person for a new term, without the tenant's consent.'' It was further held that the case was distinguishable from the case of *Underhill* v. *Collins,* 132 N. Y. 269, 270, where there was a reletting of premises leased after abandonment by the lessee and where it appeared in evidence that there was such a reletting pursuant to a conversation between the parties, a few days before the lessee vacated the premises, wherein the lessor refused to accept a surrender at request of the lessee, but then and there insisted that he would hold the tenant for the rent and would lease the premises for and on his account. In this latter case there was held to be an implied assent on the part of the lessee to the reletting for and on the lessee's account. In the case of *Gray* v. *Kaufman, &c., Co., supra,* it was found upon all the evidence that there was no such assent.

The same general doctrine is supported by other cases cited on defendant's brief, *viz.: Dagett* v. *Champney,* 122 App. Div. (N. Y.) 254; *Coe* v. *Haight,* 159 N. Y. Supp.

666, 669; *Ladd* v. *Smith,* 6 Ore. 316; *Welcome* v. *Hess,* 90 Cal. 507; *Pelton* v. *Place,* 71 Vt. 430, 438; *Haycock* v. *Johnston,* 97 Minn. 289; *Matthews' Adm'r* v. *Tobener,* 39 Mo. 115; *Rice* v. *Dudley,* 65 Ala. 68; *Nickells* v. *Atherstone,* 10 Q. B. 944; *Thomas* v. *Cook,* 2 B. & Ald. 119; see also 2 Tiffany, Land. & Ten. 1338-1342; 18 Am. & Eng. Enc. Law (2nd Ed.) 364-365.

In the examination of the many cases cited we have found some confusion and conflict of authority upon the question whether the reletting by the landlord after abandonment by the tenant amounts to an acceptance of surrender as a matter of law. As above shown we have found only two cases where it has been baldly held that the landlord after refusing to accept a surrender can, as a matter of right, without notice to the lessee, or without his assent, either express or implied, relet the premises for the account and risk of the lessee and can hold the lessee for the loss, if any. In all the other cases cited by plaintiff, above referred to, it either appears that the landlord gave notice of his intention to relet for account of the lessee or at his risk, or that there was an assent either express or implied on the part of the lessee that such reletting could be made for his benefit and on his account or at his risk. We find, therefore, that the weight of authority, so far as the facts of the case at bar are concerned, is to the effect that the reletting to a third party by the plaintiff without notice to the defendant, without knowledge on its part or without its assent, operated as an acceptance of the surrender by the defendant from and after September 1, 1907, and that after that date the defendant was no longer bound by the lease.

We also find that the defendant was bound for the rent under the lease from July 1 to September 1, 1907, and that the plaintiff is entitled to recover the sum of seventy-eight dollars and sixty-seven cents ($78.67), being two months' rent under the lease, with interest at the

rate of six (6) per cent thereon from the date of judicial demand, being the date of service of the writ, March 31, 1911, there being no evidence of demand made at any prior date.

The plaintiff's exceptions are sustained; but in our opinion there is no need of a new trial, in view of the above findings; we think that the case should be remitted to the Superior Court sitting in Providence, with direction to enter its judgment for the plaintiff for the sum with interest as above stated.

The defendant may show cause, if any it has, why this order should not be made, on Monday, June 18th, 1917, at 10 o'clock in the forenoon.

*Cooney & Cahill,* for plaintiff.
*Claude R. Branch, Edwards & Angell,* for defendant.